1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

13

14

FAIRWEATHER FISH, INC., and
CAPTAIN RAY WELSH,

                Plaintiffs,

v.

PENNY PRITZKER, in her official
capacity as Secretary of Commerce, et al.

                Defendants.

CASE NO. C14-5685 BHS

ORDER GRANTING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT IN
PART AND DENYING IT IN
PART WITHOUT PREJUDICE
AND  DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT IN PART AND
DENYING IT IN PART
WITHOUT PREJUDICE

15        This matter comes before the Court on Plaintiffs Fairweather Fish, Inc., and

16 Captain Ray Welsh's ("Plaintiffs") motion for summary judgment (Dkt. 25) and

17 Defendants National Oceanic and Atmospheric Administration ("NOAA"), National

18 Oceanic and Atmospheric Administration National Marine Fisheries Service ("NMFS"),

19 Penny Pritzker, Eileen Sobeck, and Kathryn D. Sullivan's (collectively "Defendants")

20 cross motion for summary judgment (Dkt. 29). The Court has considered the pleadings

21 filed in support of and in opposition to the motions and the remainder of the file and

22 hereby rules as follows:

# I. PROCEDURAL HISTORY

On August 27, 2014, Plaintiffs filed a complaint against Defendants challenging a final rule promulgated by Defendants on July 28, 2014.  Dkt. 1.  On October 30, 2014, Plaintiffs filed an amended complaint asserting nine claims for relief.  Dkt. 18.

On March 19, 2015, Plaintiffs filed a motion for summary judgment.  Dkt. 25.  On May 15, 2015, Defendants filed a cross motion for summary judgment.  Dkt. 29.  On June 15, 2015, Plaintiffs responded.  Dkt. 31.  On July 16, 2015, Defendants replied.  Dkt. 33.  On October 20, 2015, the Court granted Defendants' motion for summary judgment and denies Plaintiffs' motion.  Dkt. 36.  On October 21, 2015, the Clerk entered Judgment in favor of Defendants.  Dkt. 37.

On November 3, 2015, Plaintiffs filed a motion for reconsideration.  Dkt. 38.  On November 4, 2015, the Court requested a response from Defendants.  Dkt. 39.  On November 13, 2015, Defendants responded.  Dkt. 42.  On November 20, 2015, Plaintiffs replied.  Dkt. 43.  On November 27, 2015, Defendants filed a motion for leave to file a surreply and attached a proposed surreply.  Dkt. 44.  On November 30, 2015, Plaintiffs responded.  Dkt. 45.  On December 3, 2015, Defendants replied.  Dkt. 46.

On January 13, 2016, the Court granted Plaintiffs' motion for reconsideration, vacated its previous ruling and judgment.  Dkt.  48.

# II. FACTUAL BACKGROUND

In 1976, Congress enacted the Fisheries Conservation and Management Act – commonly known as the Magnuson-Stevens Act ("MSA") – to "conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic

1  commercial and recreational fishing under sound conservation and management

2  principles." 16 U.S.C. §§ 1801(b)(1), (3). The Act establishes an Exclusive Economic

3  Zone extending seaward from each coastal state, and, with exceptions not relevant here,

4  subjects each fishery within the Economic Zone to NMFS' management authority. *Id*. at

5  §§ 1802(11), 1811.

6      The MSA establishes eight regional fishery management councils, which are

7  composed of federal, state, and territorial fishery management officials with expertise in

8  conservation, management, or harvest of fishery resources within the council's

9  geographic purview. *Id*. at § 1852(b). The principal task of each council is to

10  recommend Fishery Management Plans and Plan amendments to "achieve and maintain,

11  on a continuing basis, the optimum yield" from fisheries under their authority. *Id*. at §§

12  1801(b)(4), 1852(a)(1), (h)(1). Councils may also submit regulations "necessary or

13  appropriate" to implement a Plan or Plan amendment, or to modify existing regulations.

14  *Id*. at § 1853(c). As applicable here, the North Pacific Fishery Management Council has

15  authority to recommend Fishery Management Plans, amendments, and regulations for

16  fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. *Id*. at §

17  1852(a)(1)(G).

18      Councils submit recommendations to NMFS for review and approval, disapproval,

19  or partial approval. *Id*. at §§ 1852(h), 1853(c), 1854(a)–(b). If NMFS approves all or

20  part of a council's proposal, the agency must publish notice in the Federal Register and

21  request public comment for a period of up to 60 days. *Id*. at §§ 1854(a)(1), (b)(1).

22  Among the tools available to councils is a "limited access system," or a fishery where

1    participation is restricted by regulation or by a Fishery Management Plan. *Id*. at §§

2    1802(27), 1853(b)(6).  A limited access system may include a "limited access privilege

3    program," which creates quota share ("QS") corresponding to a portion of the fishery's

4    total allowable catch. *Id*. at §§ 1802(26), 1853(b)(6); *see generally Pac. Coast Fed'n of*

5    *Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1087-88 (9th Cir. 2012).  The creation and

6    allocation of a quota does not create "any right, title, or interest in or to any fish before

7    the fish is harvested by the holder" and does not "confer any right of compensation to the

8    holder. . . if . . . revoked, limited, or modified." 16 U.S.C. §§ 1853a(b)(3), (4).

9         In 1953, Congress enacted the Halibut Act to implement a convention between the

10   United States and Canada.  16 U.S.C. § 773(a).  The act authorizes the International

11   Pacific Halibut Commission to adopt regulations for conservation of halibut along the

12   west coasts of the United States and Canada, but these regulations are not effective in the

13   United States until approved by the Secretary of State and the Secretary of Commerce

14   ("the Secretary"). *Id*. at § 773b.  Moreover, the Halibut Act authorizes NMFS to adopt

15   regulations necessary for implementation of the Convention and the Act itself. *Id*. at §

16   773c.

17        The regional councils established under the MSA may also recommend

18   regulations for halibut management. *Id*. at § 773c(c).  NMFS may approve

19   recommendations that are fair and equitable, reasonably calculated to promote

20   conservation, and carried out in such a manner that no particular individual, corporation,

21   or other entity acquires an excessive share of the halibut fishing privileges. *Id.*

22   Additionally, any regulation recommended by a council and adopted by NMFS must be

1  consistent with the MSA's provisions for limited access systems.  *Id.* (citing 16 U.S.C. §

2  1853(b)(6)).

3          Pacific Halibut (Hippoglossus stenolepis) can reach 500 pounds and reside in

4  colder waters on both sides of the Pacific Ocean, while the sablefish (Anoplopoma

5  fimbria) is a smaller, elongated species occupying waters from northern Mexico to the

6  Bering Sea. Sablefish is managed as part of the "groundfish" fishery under the MSA,

7  while halibut is regulated under the Halibut Act. By the early 1990s, both fisheries – each

8  of which relies on "hook and line" gear – were at risk of overcapitalization in Alaskan

9  coastal waters.

10         In an effort to protect halibut, sablefish, and the coastal communities that harvest

11  each species, NMFS adopted the North Pacific Council's ("Council") recommended

12  limited access privilege program in 1993.  58 Fed. Reg. 59375 (Nov. 9, 1993).  The

13  program created QS allowing "qualified persons" to harvest a portion of allowable catch

14  for sablefish or halibut, and allocated the share based upon each "qualified person's"

15  adjusted harvest of fish during the late 1980s.  57 Fed. Reg. 57130, 57133 (Dec. 3, 1992).

16  A qualified person, in relevant part, "is a citizen of the United States at the time of

17  application for QS," or a "non-individual entity," such as a "corporation, partnership, [or]

18  association." 50 C.F.R. § 679.40.  A holder of the share generally must remain onboard

19  the harvesting vessel at all times, including when landing.  50 C.F.R. §§ 679.42(c), (i).

20         QS is transferable, permitting "second generation" fishermen to harvest sablefish

21  and halibut even if they were not initial recipients of a share and efficiently allocating

22  harvesting privileges within the fleet.  57 Fed. Reg. at 57136.  As NMFS noted early on,

1   however, the free transfer of QS "could lead to an excessive share of harvesting

2   privileges . . . held by a single individual or corporation" or "to localized overfishing."

3   *Id*.  Accordingly, QS can usually move only within predefined areas, and only between

4   vessels of similar size and purpose.  *See id*. at 57134 (describing vessel categories); *id*. at

5   57136 (describing restrictions); *see generally* 50 C.F.R. § 679.41(g) (implementing

6   restrictions).  Generally, a recipient of transferred QS must have either received the share

7   during the initial allocation or crewed a vessel in any United States fishery.  50 C.F.R. §§

8   679.41(g)(1), (2).  "The rationale for this measure is to assure that [Individual Fishing

9   Quotas] remain in the hands of fishermen who have a history of past participation and

10   current dependence on the fishery."  57 Fed. Reg. at 57133.

11        In 2010, the Council was concerned that these transfer restrictions were inadequate

12   to preserve the character of the halibut and sablefish fisheries, risking consolidation of

13   QS among a small number of fishermen and discouraging formation of an "owner-

14   operated" fleet.  *See* 78 Fed. Reg. at 24708.  Thus, NMFS limited the total QS held by

15   any one person and the annual harvest from any one vessel.  *See* 50 C.F.R. §§ 679.42(e)-

16   (f), (h).  Because these measures sometimes created very small, commercially

17   unattractive portions of QS, NMFS consolidated these portions into undivided wholes, or

18   "blocks."  *See* 78 Fed. Reg. at 24708.  With certain exceptions, these blocks may be used

19   and transferred as normal QS.  50 C.F.R. §§ 679.41(e), 679.42(g).  Moreover, in certain

20   circumstances holders may consolidate, or "sweep up" blocked shares, to create a single,

21   indivisible unit.  *Id*. at §§ 679.41(e)(1), (2).

22

1    Despite NMFS' additional restrictions, NMFS claims that ongoing QS

2    consolidation threatens to exclude new fisherman and produce a fleet largely divorced

3    from the coastal communities that have traditionally depended on the halibut and

4    sablefish fisheries.  AR 10173.  According to the Council and NMFS, this phenomenon

5    largely flows from an exception to the requirement that holders of QS remain onboard the

6    harvesting vessel at all times.  *See* 50 C.F.R. at § 679.42(i)(1).  Under this exception, an

7    initial recipient of QS may use a "hired master" to harvest fish if the recipient has

8    retained a twenty percent interest in the harvesting vessel, encouraging the holder to

9    acquire and retain QS rather than let the share pass to new fisherman.  *Id*.; 78 Fed. Reg. at

10   24708-09.

11   Seeking to secure transition to an owner-operator fleet, the Council heard

12   testimony on the "hired master exception" beginning in February of 2010.  By April of

13   2011, the Council proposed to bar hired masters from harvesting Quota Share acquired

14   after February 12, 2010 (the "control date") unless that QS is consolidated, or "swept

15   up," with "blocked" QS acquired before the control date.  *Id*. at 24710.  NMFS claims

16   that these measures will further Council objectives by "(1) preventing further increase in

17   the use of hired masters while minimizing disruption to operations of small businesses

18   that have historically used hired masters, and (2) discouraging further consolidation of

19   QS among initial recipients who use hired masters."  *Id*. at 24709.  On April 26, 2013,

20   NMFS proposed a rule to this effect, allowed public comments, and issued a final rule on

21   July 28, 2014.  79 Fed. Reg. 43679 ("Final Rule").  The rule became effective on

22   December 1, 2014 (the "effective date"), or nearly five years after the control date.  *Id*.

1   The Final Rule governs both "fixed-gear commercial Pacific halibut and sablefish

2   fisheries in the Bering Sea and Aleutian Islands and the Gulf of Alaska."  *Id.*

3   **III. DISCUSSION**

4   **A.      Summary Judgment Standard**

5          Summary judgment is proper only if the pleadings, the discovery and disclosure

6   materials on file, and any affidavits show that there is no genuine issue as to any material

7   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

8   The moving party is entitled to judgment as a matter of law when the nonmoving party

9   fails to make a sufficient showing on an essential element of a claim in the case on which

10  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

11  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

12  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

13  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

14  present specific, significant probative evidence, not simply "some metaphysical doubt").

15  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

16  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

17  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

18  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

19  626, 630 (9th Cir. 1987).

20         The determination of the existence of a material fact is often a close question. The

21  Court must consider the substantive evidentiary burden that the nonmoving party must

22  meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

1  U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

2  issues of controversy in favor of the nonmoving party only when the facts specifically

3  attested by that party contradict facts specifically attested by the moving party.  The

4  nonmoving party may not merely state that it will discredit the moving party's evidence

5  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

6  *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

7  nonspecific statements in affidavits are not sufficient, and missing facts will not be

8  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

9  **B.      The MSA, Halibut Act, and the National Standards**

10          At this point, it is undisputed that the National Standards apply to the Final Rule

11  because the Final Rule regulates the sablefish fishery.  With regard to standards 9 and 10,

12  the Court noted in its previous opinion that Defendants "failed to even consider" these

13  standards.  Dkt. 36 at 10 n.1.  The Court's statement is not entirely accurate because

14  Defendants cited the record showing that NOAA concluded that, for each standard, the

15  "alternatives are consistent with this standard."  AR 10215.  These assertions, however,

16  are not even cursory, they are conclusory.  *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d

17  1104, 1123 (9th Cir. 2006) ("Although cursory, this analysis indicates that the NMFS

18  considered National Standard No. 10 and thus discharged its duty under § 1855(a)(10).").

19  Thus, Plaintiffs' argument that Defendants failed to properly assess the Final Rule in light

20  of the national standards has merit.

21          Defendants provide two arguments in response.  First, Defendants argue that

22  Plaintiffs waived these arguments because Plaintiffs failed to expressly raise the

1    argument during the agency proceeding.  Dkt. 29 at 26–28; Dkt. 33 at 6–7; Dkt. 42 at 5.

2    While Defendants are correct that this rule applies in some circumstances, they fail to

3    show that it applies in this case.  For example, when a party challenges an agency's

4    failure to consider proposed alternatives to the proposed action that were not presented to

5    the agency, the Supreme Court has held that the party has forfeited any objections based

6    on those proposed alternatives.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–765

7    (2004) ("Respondents have therefore forfeited any objection to the [Environmental

8    Assessment] on the ground that it failed adequately to discuss potential alternatives to the

9    proposed action.").  However, Defendants have failed to cite, and the Court is unaware

10   of, any authority that has adopted the waiver rule when a party contends that an agency

11   failed to comply with statutory mandates.  Although dicta, the Supreme Court stated that

12   "the agency bears the primary responsibility to ensure that it complies with [federal law] .

13   . . ."  *Id*. at 765.  This is the most reasonable application of the law, and, in the context of

14   this case, Defendants must ensure that "[a]ny fishery management plan . . . *shall* be

15   consistent with the following national standards . . . ."  16 U.S.C. § 1851(a).  Therefore,

16   the Court denies Defendants' motion on the issue of waiver.

17        Second, Defendants contend that it is Plaintiffs' burden to submit evidence

18   establishing that implementation of the Final Rule will violate a particular national

19   standard.  Dkt. 42 at 6.  Defendants, however, again fail to recognize Congress's mandate

20   that they must ensure that the Final Rule is consistent with the National Standards.  A

21   bare conclusion that the rule is consistent with a particular standard is arbitrary,

22   capricious, and otherwise not in accordance with law.  Moreover, Defendants concede

1    that "National Standard 10 was never at issue during the [Final Rule's] development" and

2    rely on *Oregon Trollers* to provide post issuance, litigation driven rationalizations.  Dkt.

3    29 at 37–38.  Defendants contend that the Final Rule is "neutral" as to safety at sea and

4    promotes safety to the extent practicable.  But, in *Oregon Trollers*, the agency provided

5    this reasoning, not the agency's lawyers during litigation.  452 F.3d at 1123.  "[T]he

6    agency must examine the relevant data and articulate a satisfactory explanation for its

7    action including a 'rational connection between the facts found and the choice made.'"

8    *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

9    (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  In this

10   case, Defendants did not provide *any* reason for why the Final Rule was "consistent" with

11   at least National Standards 9 or 10.  Therefore, the Court grants Plaintiffs' motion on this

12   issue.

13   **C.      Other Issues and Remedy**

14          Although the Court previously considered the Rehabilitation Act and retroactivity,

15   the Court declines to consider these issues at this time.  The "cardinal principle of judicial

16   restraint" is that "if it is not necessary to decide more, it is necessary not to decide more."

17   *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F. 3d 786, 799 (D.C. Cir. 2004)

18   (Roberts, J., concurring in part and concurring in judgment).  Defendants requested that,

19   if the Court found for Plaintiffs on any issue, the Court allow the parties "an opportunity

20   to brief the appropriate remedy."  Dkt. 33 at 17.  The Court agrees with Defendants

21   because the parties dispute the breadth of any remedy and Defendants imply that the

22   Court may essentially sever the rule with respect to the different fisheries.  Dkt. 42 at 7.

1   Therefore, the Court requests a proposed briefing schedule as to any remedy as a result of

2   this order.  After a remedy is determined, if the Court concludes that it must address the

3   other issues in this case, then the parties' motions will be renoted on the Court's calendar.

4                                              **IV. ORDER**

5           Therefore, it is hereby **ORDERED** that Plaintiffs' motion for summary judgment

6   (Dkt. 25) is **GRANTED in part** and **DENIED in part without prejudice** and

7   Defendants' cross motion for summary judgment (Dkt. 29) is **DENIED in part with**

8   **prejudice** and **DENIED in part without prejudice**.  The parties shall submit a briefing

9   schedule for remedies.

10          Dated this 13th day of January, 2016.

11

12                                                    _____
                                                     BENJAMIN H. SETTLE
13                                                   United States District Judge

14

15

16

17

18

19

20

21

22