UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

FAIRWEATHER FISH, INC., and
CAPTAIN RAY WELSH,

                    Plaintiffs,

v.

PENNY PRITZKER, in her official
capacity as Secretary of Commerce, et al.,

                    Defendants.

CASE NO. C14-5685 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFFS' AND
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT,
VACATING RULE IN PART,
AND REMANDING RULE FOR
FURTHER CONSIDERATION

        This matter comes before the Court on Plaintiffs Fairweather Fish, Inc., and

Captain Ray Welsh's ("Plaintiffs") motion for summary judgment (Dkt. 25) and

Defendants National Oceanic and Atmospheric Administration ("NOAA"), National

Oceanic and Atmospheric Administration National Marine Fisheries Service ("NMFS"),

Penny Pritzker, Eileen Sobeck, and Kathryn D. Sullivan's (collectively "Defendants")

cross motion for summary judgment (Dkt. 29). The Court has considered the pleadings

filed in support of and in opposition to the motions and the remainder of the file and

hereby rules as follows:

# I. PROCEDURAL HISTORY

On August 27, 2014, Plaintiffs filed a complaint against Defendants challenging a rule promulgated by Defendants on July 28, 2014.  Dkt. 1.  The rule provides additional regulations for the fixed-gear commercial halibut and sablefish fisheries in the North Pacific Ocean. 79 Fed. Reg. 43679 ("Final Rule").  NMFS adopted the rule pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and the Northern Pacific Halibut Act of 1982 ("Halibut Act").  *Id*.  Basically, the commercial fishermen were issued Quota Shares ("QS") and the Final Rule mandated, with some exceptions, that owners of a QS could not use hired masters to harvest any QS obtained after February 12, 2010 (the "control date").  *Id*.

On October 30, 2014, Plaintiffs filed an amended complaint asserting nine claims for relief.  Dkt. 18.  Two causes of action claim violations of the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq*., based on Captain Welsh's disabilities, two causes of action claim violations of constitutional rights based on impermissible retroactive application, four causes of action claim Defendants failed to properly consider the national standards for fishery conservation and management, 16 U.S.C. § 1851(a) ("National Standards"), and the final cause of action alleges that the Final Rule "is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law . . . ."  *Id*.

On March 19, 2015, Plaintiffs filed a motion for summary judgment.  Dkt. 25.  On May 15, 2015, Defendants filed a cross motion for summary judgment.  Dkt. 29.  On October 20, 2015, the Court granted Defendants' motion for summary judgment and

1  denied Plaintiffs' motion.  Dkt. 36.  On October 21, 2015, the Clerk entered judgment in

2  favor of Defendants.  Dkt. 37.

3         On November 3, 2015, Plaintiffs filed a motion for reconsideration.  Dkt. 38.  On

4  January 13, 2016, the Court granted Plaintiffs' motion for reconsideration, vacated its

5  previous ruling and judgment, and issued an order granting Plaintiffs' motion for

6  summary judgment in part, denying it in part, and denying Defendants' motion in part.

7  Dkts.  48, 49.  The Court granted Plaintiffs' motion on their claims that Defendants

8  violated the National Standards, requested additional briefing on an appropriate remedy,

9  and denied the remainder of the motions without prejudice. Dkt. 49.

10         On September 2, 2016, the Court requested additional briefing on three issues and

11  renoted the parties' motions for summary judgment on the issues that were denied

12  without prejudice.  Dkt. 62.  On September 16, 2016, both parties filed supplemental

13  opening briefs.  Dkts. 63, 64.  On September 23, 2016, both parties filed supplemental

14  response briefs.  Dkts. 65, 66.

15  ## II. FACTUAL BACKGROUND

16         In 1976, Congress enacted the MSA to "conserve and manage the fishery

17  resources found off the coasts of the United States" and "to promote domestic

18  commercial and recreational fishing under sound conservation and management

19  principles."  16 U.S.C. §§ 1801(b)(1), (3).  The Act establishes an Exclusive Economic

20  Zone extending seaward from each coastal state, and, with exceptions not relevant here,

21  subjects each fishery within the Economic Zone to NMFS' management authority.  *Id*. at

22  §§ 1802(11), 1811.

The MSA establishes eight regional fishery management councils, which are composed of federal, state, and territorial fishery management officials with expertise in conservation, management, or harvest of fishery resources within the council's geographic purview. *Id*. at § 1852(b). The principal task of each council is to recommend Fishery Management Plans and Plan amendments to "achieve and maintain, on a continuing basis, the optimum yield" from fisheries under their authority. *Id*. at §§ 1801(b)(4), 1852(a)(1), (h)(1). Councils may also submit regulations "necessary or appropriate" to implement a Plan or Plan amendment, or to modify existing regulations. *Id*. at § 1853(c). As applicable here, the North Pacific Fishery Management Council ("NP Council") has authority to recommend Fishery Management Plans, amendments, and regulations for fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. *Id*. at § 1852(a)(1)(G).

Councils submit recommendations to NMFS for review and approval, disapproval, or partial approval. *Id*. at §§ 1852(h), 1853(c), 1854(a)–(b). If NMFS approves all or part of a council's proposal, the agency must publish notice in the Federal Register and request public comment for a period of up to 60 days. *Id*. at §§ 1854(a)(1), (b)(1). Among the tools available to councils is a "limited access system," or a fishery where participation is restricted by regulation or by a Fishery Management Plan. *Id*. at §§ 1802(27), 1853(b)(6). A limited access system may include a "limited access privilege program," which creates QS corresponding to a portion of the fishery's total allowable catch. *Id*. at §§ 1802(26), 1853(b)(6); *see generally Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1087–88 (9th Cir. 2012). The creation and allocation of

1   a quota does not create "any right, title, or interest in or to any fish before the fish is

2   harvested by the holder" and does not "confer any right of compensation to the holder. . .

3   if . . . revoked, limited, or modified."  16 U.S.C. §§ 1853a(b)(3), (4).

4          In 1953, Congress enacted the Halibut Act to implement a convention between the

5   United States and Canada.  16 U.S.C. § 773(a).  It authorizes the International Pacific

6   Halibut Commission to adopt regulations for conservation of halibut along the west

7   coasts of the United States and Canada, but these regulations are not effective in the

8   United States until approved by the Secretary of State and the Secretary of Commerce

9   ("the Secretary").  *Id.* at § 773b.  Moreover, the Halibut Act authorizes NMFS to adopt

10  regulations necessary for implementation of the convention and the Halibut Act itself.  *Id.*

11  at § 773c.

12         The regional councils established under the MSA may also recommend

13  regulations for halibut management.  *Id.* at § 773c(c).  NMFS may approve

14  recommendations that are fair and equitable, reasonably calculated to promote

15  conservation, and carried out in such a manner that no particular individual, corporation,

16  or other entity acquires an excessive share of the halibut fishing privileges.  *Id.*

17  Additionally, any regulation recommended by a council and adopted by NMFS must be

18  consistent with the MSA's provisions for limited access systems.  *Id.* (citing 16 U.S.C. §

19  1853(b)(6)).

20         Pacific Halibut (Hippoglossus stenolepis) can reach 500 pounds and reside in

21  colder waters on both sides of the Pacific Ocean, while the sablefish (Anoplopoma

22  fimbria) is a smaller, elongated species occupying waters from northern Mexico to the

Bering Sea. Sablefish is managed as part of the "groundfish" fishery under the MSA, while halibut is regulated under the Halibut Act. By the early 1990s, both fisheries – each of which relies on "hook and line" gear – were at risk of overcapitalization in Alaskan coastal waters.

In an effort to protect halibut, sablefish, and the coastal communities that harvest each species, NMFS adopted the NP Council recommended limited access privilege program in 1993.  58 Fed. Reg. 59375 (Nov. 9, 1993).  The program created QS allowing "qualified persons" to harvest a portion of allowable catch for sablefish or halibut, and allocated the share based upon each "qualified person's" adjusted harvest of fish during the late 1980s.  57 Fed. Reg. 57130, 57133 (Dec. 3, 1992).  A qualified person, in relevant part, "is a citizen of the United States at the time of application for QS," or a "non-individual entity," such as a "corporation, partnership, [or] association." 50 C.F.R. § 679.40.  A holder of the share generally must remain onboard the harvesting vessel at all times, including when landing.  50 C.F.R. §§ 679.42(c), (i).

QS is transferable, permitting "second generation" fishermen to harvest sablefish and halibut even if they were not initial recipients of a share and efficiently allocating harvesting privileges within the fleet.  57 Fed. Reg. at 57136.  As NMFS noted early on, however, the free transfer of QS "could lead to an excessive share of harvesting privileges . . . held by a single individual or corporation" or "to localized overfishing." *Id*.  Accordingly, QS can usually move only within predefined areas, and only between vessels of similar size and purpose.  *See id*. at 57134 (describing vessel categories); *id*. at 57136 (describing restrictions); *see generally* 50 C.F.R. § 679.41(g) (implementing

1  restrictions).  Generally, a recipient of transferred QS must have either received the share

2  during the initial allocation or crewed a vessel in any United States fishery.  50 C.F.R. §§

3  679.41(g)(1), (2).  "The rationale for this measure is to assure that [Individual Fishing

4  Quotas] remain in the hands of fishermen who have a history of past participation and

5  current dependence on the fishery."  57 Fed. Reg. at 57133.

6      In 2010, the NP Council was concerned that these transfer restrictions were

7  inadequate to preserve the character of the halibut and sablefish fisheries, risking

8  consolidation of QS among a small number of fishermen and discouraging formation of

9  an "owner-operated" fleet.  *See* 78 Fed. Reg. at 24708.  Thus, NMFS limited the total QS

10 held by any one person and the annual harvest from any one vessel.  *See* 50 C.F.R. §§

11 679.42(e)-(f), (h).  Because these measures sometimes created very small, commercially

12 unattractive portions of QS, NMFS consolidated these portions into undivided wholes, or

13 "blocks."  *See* 78 Fed. Reg. at 24708.  With certain exceptions, these blocks may be used

14 and transferred as normal QS.  50 C.F.R. §§ 679.41(e), 679.42(g).  Moreover, in certain

15 circumstances holders may consolidate, or "sweep up" blocked shares, to create a single,

16 indivisible unit.  *Id.* at §§ 679.41(e)(1), (2).

17     Despite NMFS' additional restrictions, NMFS claims that ongoing QS

18 consolidation threatens to exclude new fisherman and produce a fleet largely divorced

19 from the coastal communities that have traditionally depended on the halibut and

20 sablefish fisheries.  AR 10173.  According to the NP Council and NMFS, this

21 phenomenon largely flows from an exception to the requirement that holders of QS

22 remain onboard the harvesting vessel at all times.  *See* 50 C.F.R. at § 679.42(i)(1).  Under

1    this exception, an initial recipient of QS may use a "hired master" to harvest fish if the

2    recipient has retained a twenty percent interest in the harvesting vessel, encouraging the

3    holder to acquire and retain QS rather than let the share pass to new fishermen. *Id*.; 78

4    Fed. Reg. at 24708–09.

5         Seeking to secure transition to an owner-operator fleet, the NP Council heard

6    testimony on the "hired master exception" beginning in February of 2010.  At the 196th

7    Plenary Session of the NP Council, held February 10–15 in Portland, Oregon, Council

8    Member Dan Hull presented a motion that included a proposal to "[i]nitiate an analysis to

9    prohibit use of hired skippers for future transfers of halibut and sablefish B, C, and D

10   class QS, and set a control date of February 12, 2010."  AR 30378.  The motion passed

11   with an 8 to 3 vote.  AR 30379.  The front page of the NP Council's February 2010

12   newsletter provides a summary of the motion as follows:

13        A second IFQ amendment would prohibit use of hired skippers for
          future transfers of halibut and sablefish catcher vessel QS by initial
14        recipients, using a control date of February 12, 2010. The Council
          identified an array of issues for both individual initial QS recipients and
15        corporate initial QS recipients to be addressed in the analysis. The Council
          also discussed its December 2007 recommendation to implement a 12-
16        month requirement, along with an exception for constructive loss of a
          vessel, for the 20 percent ownership stake in a vessel on which IFQs would
17        be allowed to be fished by a hired skipper.

18   AR 30440.

19        By April of 2011, the Council proposed to bar hired masters from harvesting

20   Quota Share acquired after February 12, 2010 (the "control date") unless that QS is

21   consolidated, or "swept up," with "blocked" QS acquired before the control date.  *Id*. at

22   24710.  NMFS claims that these measures will further Council objectives by "(1)

1   preventing further increase in the use of hired masters while minimizing disruption to

2   operations of small businesses that have historically used hired masters, and (2)

3   discouraging further consolidation of QS among initial recipients who use hired masters."

4   *Id*. at 24709.  On April 26, 2013, NMFS proposed a rule to this effect, allowed public

5   comments, and issued a final rule on July 28, 2014. 79 Fed. Reg. 43679 ("Final Rule").

6   The rule became effective on December 1, 2014 (the "effective date"), or nearly five

7   years after the control date.  *Id*.

8                          **III. DISCUSSION**

9   **A.      Summary Judgment Standard**

10          Summary judgment is proper only if the pleadings, the discovery and disclosure

11  materials on file, and any affidavits show that there is no genuine issue as to any material

12  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

13  The moving party is entitled to judgment as a matter of law when the nonmoving party

14  fails to make a sufficient showing on an essential element of a claim in the case on which

15  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

16  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

17  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

18  *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

19  present specific, significant probative evidence, not simply "some metaphysical doubt").

20  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

21  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

22  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477

1  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

2  626, 630 (9th Cir. 1987).

3      The determination of the existence of a material fact is often a close question. The

4  Court must consider the substantive evidentiary burden that the nonmoving party must

5  meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

6  U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual

7  issues of controversy in favor of the nonmoving party only when the facts specifically

8  attested by that party contradict facts specifically attested by the moving party.  The

9  nonmoving party may not merely state that it will discredit the moving party's evidence

10  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

11  *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

12  nonspecific statements in affidavits are not sufficient, and missing facts will not be

13  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

14  **B.      Rehabilitation Act**

15      In the complaint, Captain Welsh asserts a cause of action for a violation of the

16  Rehabilitation Act and an alternative cause of action for violation of the Rehabilitation

17  Act and the APA.  Dkt. 17, ¶¶ 56–87.  The parties dispute (1) whether Captain Welsh

18  may bring a standalone Rehabilitation Act claim, (2) the appropriate burden of proof, and

19  (3) the merits of the claims.  With regard to the first issue, there is authority for the

20  proposition that "the private right of action established under § 504(a) [of the

21  Rehabilitation Act] by the Ninth Circuit is limited to equitable remedies."  *Mendez v.*

22

1    *Gearan*, 947 F. Supp. 1364, 1367 (N.D. Cal. 1996).  Therefore, the Court denies

2    Defendants' motion on this issue.

3          With regard to the standard of review, the Court is unaware of and Plaintiffs have

4    failed to cite any case law for the proposition that the burden is a preponderance of the

5    evidence.  Captain Welsh does cite two cases in support of his position, but neither of the

6    cases hold what Captain Welsh claims.  Dkt. 31 at 18.  In *Ramirez v. Hart*, 2014 WL

7    2170376 (W.D. Wash. May 23, 2014), the court merely stated that plaintiff had failed to

8    make a "sufficient showing on all essential elements of her claim, on which she has the

9    burden of proof."  *Id*. at *7.  The court neither held nor elaborated on plaintiff's actual

10   burden of proof.  Thus, *Ramirez* does not stand for the proposition that the burden of

11   proof is preponderance of the evidence.

12         In *J.L. v. Soc. Sec. Admin*., 971 F.2d 260 (9th Cir. 1992), *disapproved of by Lane*

13   *v. Pena*, 518 U.S. 187 (1996), the plaintiffs argued that the burden of proof under the

14   Rehabilitation Act should be "the familiar preponderance of the evidence standard of

15   civil litigation."  *Id*. at 267.  The Ninth Circuit rejected that argument.  *Id*.  Instead, the

16   Ninth Circuit stated that an agency like NMFS "has no discretion to violate the

17   Rehabilitation Act" because it is "a statute over which it claims no special expertise."  *Id*.

18   at 268.  In such circumstances, the issue before the Court is a question of law determined

19   *de novo* once the plaintiffs reach the court for review of a final agency determination.  *Id*.

20   at 267.  Therefore, the Court denies Captain Walsh's motion on this issue and will review

21   the Final Rule *de novo* to determine whether the rule is "otherwise not in accordance with

22

1    law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of

2    statutory right."  5 U.S.C. § 706(2)(A), (C).

3         With regard to the merits of Captain Welsh's Rehabilitation Act claims, he must

4    show that "(1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to

5    receive the benefit; (3) he was denied the benefits of the program solely by reason of his

6    disability; and (4) the program receives federal financial assistance." *Weinreich v. Los*

7    *Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (quoting 29

8    U.S.C. § 794).

9         In this case, Defendants do not dispute that Captain Welsh meets the elements set

10   forth above.[1]  Defendants, however, argue that the Final Rule "passes muster under the

11   Rehabilitation Act because it provides disabled persons with meaningful access to the

12   Fishing Quota Program."  Dkt. 29 at 48.  The Court agrees to the extent that Captain

13   Welsh has been provided reasonable access to the program.  The Ninth Circuit "has

14   recognized that the focus of the prohibition in § 504 is 'whether disabled persons were

15   denied meaningful access to state-provided services.'"  *Mark H. v. Lemahieu*, 513 F.3d

16   922, 937 (9th Cir. 2008) (quoting *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th

17   Cir.1996).  A defendant "may be required to make reasonable, but not fundamental or

18   _____

19        [1] Although Plaintiffs argue on behalf of Captain Welsh and other similar disabled
     individuals, the Court will limit its review and requested injunctive relief to the fact of Captain
20   Welsh's situation, the only party in the instant suit. The question whether a particular
     accommodation is reasonable "depends on the individual circumstances of each case" and
21   "requires a fact-specific, individualized analysis of the disabled individual's circumstances and
     the accommodations that might allow him to meet the program's standards." *Wong v. Regents of*
22   *the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999).  Moreover, an overbroad injunction is an
     abuse of discretion. *United States v. BNS, Inc.*, 858 F.2d 456, 460 (9th Cir. 1988).

1   substantial, modifications to its programs." *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015,

2   1020 (9th Cir. 2002).  As such, the Ninth Circuit has held that the Rehabilitation Act

3   "establish[es] only a comparative obligation."  *Mark H.*, 513 F.3d at 939.

4         After assessing the competing interests, the Court concludes that Captain Welsh

5   has been provided meaningful access to the program.  First, Captain Welsh does not

6   dispute Defendants' contention that the Final Rule "only affects *at most* 30% of his

7   income from Quota Share."  Dkt. 29 at 48 (citing Dkt. 25-2 Declaration of Captain

8   Welsh, ¶ 7).  Second, Captain Welsh may apply for medical exceptions for two out of

9   every five years for the affected portion of his share.  50 C.F.R. § 679.42(d)(2).[2]   When

10   compared with the competing obligation of regulating the dangerous activity of fishing

11   on the open ocean and the competing goals of allowing access to new entrants, as well as

12   providing means for local coastal communities, the Court declines to impose a

13   fundamental and substantial modification on Defendants by setting aside the Final Rule

14   on this basis.  Therefore, the Court denies Captain Welsh's motion and grants

15   Defendants' motion on Captain Welsh's first and second claims for relief.

16   **C.     The Antiretroactivity Principle**

17         In their complaint, Plaintiffs assert a cause of action for impermissible retroactive

18   application of law and a cause of action for a violation of their Fifth Amendment right to

19   due process of law.  Dkt. 17, ¶¶ 88–100.  Defendants argue that the due process claim is

20   superfluous and need not be addressed by the Court.  Dkt. 29 at 46.  Plaintiffs counter

21

22            [2] Captain Welsh does not challenge this rule under the Rehabilitation Act.

1    that the issues are inextricably intertwined.  Dkt. 31 at 24 n.10.  The Supreme Court has

2    recognized that "the presumption against retroactive legislation is deeply rooted in our

3    jurisprudence, and embodies a legal doctrine centuries older than our Republic."

4    *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).  "It is therefore not surprising

5    that the antiretroactivity principle finds expression in several provisions of our

6    Constitution," including the Due Process Clause.  *Id*. at 266.

7        In this case, Plaintiffs' due process claim is based on allegations of no reasonable

8    notice.  Dkt. 17, ¶ 98; Dkt. 31 at 23–24.  Plaintiffs cite case law to the Court wherein the

9    issues presented were whether the complaining parties had reasonable notice and

10   opportunity to be heard as to proposed rules that included previous "control dates."  For

11   example, in *Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce*, 720

12   F. Supp. 2d 564 (D.N.J. 2010), *aff'd sub nom. Gen. Category Scallop Fishermen v. Sec'y,*

13   *U.S. Dep't of Commerce*, 635 F.3d 106 (3d Cir. 2011), the plaintiffs argued that their due

14   process rights were violated because the relevant agency adopted a final rule on April 14,

15   2008 with a November 1, 2004 control date.  The court disagreed concluding that the

16   plaintiffs had sufficient notice of the proposed rule, which included the proposed control

17   date, and multiple opportunities to be heard before the rule was adopted.

18       Similar to *Scallop Fishermen*, Plaintiffs in this case had sufficient notice and

19   opportunity to be heard regarding the February 12, 2010 control date.  In fact, the

20   proposed rule, which included the relevant date, was published in the Federal Register on

21   April 26, 2013.  78 Fed. Reg. 24710 ("a hired master could not be used to fish IFQ

22   halibut or sablefish derived from catcher vessel QS that was received by transfer after

1  February 12, 2010 . . . .").  Moreover, it is undisputed that there were opportunities for

2  public comment before the Final Rule was adopted.  To the extent that Plaintiffs argue

3  that they should have received notice before February 12, 2010 that Defendants would

4  adopt a Final Rule on July 28, 2014 with the relevant control date, their argument is

5  without merit because they fail to cite any precedent holding that due process affords

6  such protections.  *See* Dkt. 31 at 24.  Due process guarantees notice and an opportunity to

7  be heard on proposed legislation, which Plaintiffs were undisputedly provided.

8  Therefore, the Court denies Plaintiffs' motion and grants Defendants' motion on

9  Plaintiffs' due process claim.

10        With regard to Plaintiffs' other claim, they assert that the Final Rule is

11  impermissibly retroactive.  Dkt. 25 at 24–32. "[T]he presumption against retroactive

12  legislation is deeply rooted" in the law, since "[e]lementary considerations of fairness

13  dictate that individuals should have an opportunity to know what the law is and to

14  conform their conduct accordingly." *Landgraf*, 511 U.S. 244, 265 (1994).  Thus,

15  "statutory retroactivity has long been disfavored," though not flatly prohibited, and courts

16  ordinarily do not give effect to retroactive law.  *Id.* at 268.  This principle applies equally

17  to administrative rulemaking.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208

18  (1988).

19        The Ninth Circuit has set forth "a two-step framework to determine if [a rule] has

20  a retroactive effect." *Sacks v. S.E.C.*, 648 F.3d 945, 951 (9th Cir. 2011).  First, the court

21  must "determine whether the statute or regulation clearly expresses that the law is to be

22  applied retroactively." *Id.* (citing *Mejia v. Gonzales*, 499 F.3d 991, 997 (9th Cir. 2007)).

1   If not, the court must "consider whether application of the regulation would have a

2   retroactive effect by attach[ing] new legal consequences to events completed before its

3   enactment." *Id*. (internal quotations omitted).  If, under this second step, the statute or

4   regulation has retroactive effect, "it does not govern absent clear congressional intent

5   favoring such a result." *Koch v. SEC*, 177 F.3d 784, 786 (9th Cir. 1999) (quoting

6   *Landgraf*, 511 U.S. at 280); *see Bowen*, 488 U.S. at 208.

7       In this case, the Final Rule does not clearly express that it is to be applied

8   retroactively.  Although the rule affects shares that were transferred or acquired before

9   the effective date, the rule only restricts future harvests of fish.  In other words, harvests

10  caught before December 1, 2014 need not comply with the Final Rule.  Therefore, the

11  Court will proceed to step two of the analysis.

12      "The inquiry into whether a statute [or regulation] operates retroactively demands

13  a commonsense, functional judgment about whether the new provision attaches new legal

14  consequences to events completed before its enactment." *I.N.S. v. St. Cyr*, 533 U.S. 289,

15  321 (2001) (internal quotations omitted).  A regulation has retroactive effect "when it

16  takes away or impairs vested rights acquired under existing laws, or creates a new

17  obligation, imposes a new duty, or attaches a new disability, in respect to transactions or

18  considerations already past." *Id*. (internal quotations omitted).  A judgment bearing on

19  retroactivity should be guided by "fair notice, reasonable reliance, and settled

20  expectations." *Id*. (internal quotations omitted).  Finally, "[t]he largest category of cases

21  in which we have applied the presumption against statutory retroactivity has involved

22

1  new provisions affecting contractual or property rights, matters in which predictability

2  and stability are of prime importance." *Landgraf*, 511 U.S. at 271 (1994).

3        Upon review of the case law, the Court finds the controlling principles muddled, at

4  best.  *See*, *e.g.*, *Polone v. C.I.R.*, 505 F.3d 966, 972 (9th Cir. 2007) ("the Supreme Court

5  has provided various formulas for determining whether a particular statute applies

6  retroactively."); *Landgraf*, 511 U.S. at 270 ("Any test of retroactivity will leave room for

7  disagreement in hard cases, and is unlikely to classify the enormous variety of legal

8  changes with perfect philosophical clarity.").  One principle, however, is apparent and

9  counsels in favor of concluding that the Final Rule improperly applies retroactively.

10 Cases arising in various areas of the law make a distinction between regulations that

11 completely extinguish rights and regulations that only impose additional burdens on an

12 individual's rights.  For example, in *St. Cyr*, the Supreme Court considered an

13 immigration regulation that removed the Attorney General's discretion to waive

14 deportation proceedings against permanent resident aliens who had been convicted of

15 certain felonies.  533 U.S. at 293–98.  The defendant, Enrico St. Cyr, accepted a plea

16 bargain to a crime that made him automatically deportable, but eligible for a waiver of

17 deportation at the discretion of the Attorney General.  *Id*. at 293.  Then, Congress passed

18 the regulation in question, stripping the Attorney General of any discretion to waive the

19 proceeding, and deportation proceedings were initiated against St. Cyr.  *Id*.  The Court

20 held that the regulation was impermissibly retroactive because it completely stripped St.

21 Cyr of rights he possessed when he accepted the plea bargain.  *Id*. at 321–25.

22

1    Similar to *St. Cyr*, in *Mejia*, 499 F.3d 991, the Ninth Circuit considered a

2  regulation adopted by the Attorney General that further interpreted the same waiver

3  provision.  The federal statute authorized the Attorney General to waive deportation

4  proceedings if the denial of admission would result in "extreme hardship" to the alien or

5  an immediate family member.  8 U.S.C. § 1182(h)(1)(B).  In 2003, the Attorney General

6  adopted a regulation stating that waivers would be denied unless "the alien clearly

7  demonstrates that the denial of [relief] would result in exceptional and extremely unusual

8  hardship."  8 C.F.R. § 212.7(d).  Like St. Cyr, Jorge Humberto Mejia accepted a plea

9  bargain before the regulation was adopted and faced deportation proceedings after the

10 regulation was adopted.  *Mejia*, 499 F.3d at 994–95.  Mejia argued that the new standard

11 was impermissibly retroactive.  *Id*. at 997–98.  The Ninth Circuit, however, rejected that

12 argument because "[b]oth before and after the adoption of the regulation, Mejia faced

13 only possible deportation."  *Id*. at 998.  "As the Supreme Court observed in *St. Cyr*,

14 '[t]here is a clear difference, for the purposes of retroactivity analysis, between facing

15 possible deportation and facing certain deportation.'"  *Id*. at 998 (quoting *St. Cyr*, 533

16 U.S. at 325).  Thus, *St. Cyr* and *Mejia* illustrate the difference between a regulation that

17 completely vitiates one's rights and a regulation that adversely affects those same rights.

18    In the context of property law, courts have labeled the adverse affect on rights as

19 "imposing additional burdens" on the exercise of one's rights or merely "frustrating

20 business expectations."  *See*, *e.g*., *Polone*, 505 F.3d at 972 ("a change in the property tax

21 regime would not be considered retroactive with respect to all who had purchased

22 property prior to the effective date of the amendment."); *Chem. Waste Mgmt., Inc. v.*

1    *U.S.E.P.A.*, 869 F.2d 1526, 1536 (D.C. Cir. 1989).  For example, in *Waste Mgmt.*, the

2    Environmental Protection Agency ("EPA") adopted a rule requiring the management of

3    certain hazardous waste material no matter when the waste was disposed of.  *Id*. at 211–

4    212.  The plaintiffs were numerous hazardous waste disposal site owners that, under the

5    new regulation, would be required to manage covered waste regardless of when the waste

6    was deposited at the particular site.  *Id*.  The court framed the question as follows:

7            [D]id the agency improperly engage in retroactive rulemaking in ordering
             that its leachate regulations be made applicable to leachate derived from
8            wastes which were not deemed hazardous at the time they were disposed?

9    *Id*. at 213.  In rejecting the plaintiffs' argument that the regulation applied retroactively,

10   the court provided as follows:

11           As a practical matter, of course, a landfill operator has little choice
          but to collect and manage its leachate. Active management of leachate is
12        sound environmental practice, and a panoply of regulations require it. A
          landfill operator therefore finds its present range of options constrained by
13        its own past actions (the decision to accept certain wastes) even though it
          could not have foreseen those consequences when the actions occurred.
14        This does not, however, make the rule a retroactive regulation. It is often
          the case that a business will undertake a certain course of conduct based on
15        the current law, and will then find its expectations frustrated when the law
          changes. This has never been thought to constitute retroactive lawmaking,
16        and indeed most economic regulation would be unworkable if all laws
          disrupting prior expectations were deemed suspect.
17
     *Id*. at 217 (footnotes omitted).
18
             In this case, the Final Rule goes well beyond frustrating Plaintiffs' business
19
     expectations.  In explaining the effect of the rule, the Secretary provided as follows:
20
          The Council noted that under the proposed action, initial QS recipients
21        would have options for using QS received by transfer after February 12,
          2010. Specifically, initial recipients who received catcher vessel QS after
22        February 12, 2010, could choose to sell those QS to other halibut and

ORDER - 19

1   sablefish IFQ fishery participants, or to new entrants into the fishery. Other
    than selling the QS, the options and associated impacts differ between
2   individual and non-individual initial recipients. An individual initial
    recipient who receives catcher vessel QS after February 12, 2010, could
3   choose to fish the IFQ derived from that QS as an owner onboard. A non-
    individual initial recipient who received catcher vessel QS by transfer after
4   February 12, 2010, could also choose to fish the resulting IFQ using a hired
    master, but only until the effective date of this action. After the effective
5   date, a non-individual initial recipient would be prohibited from fishing QS
    received by transfer after February 12, 2010, using a hired master, but
6   could, as noted above, sell those QS. Alternatively, a non-individual initial
    recipient could continue to hold that QS, but the resulting IFQ could not be
7   used because a non-individual entity must hire a master to harvest the IFQ.

8   78 Fed. Reg. 24709.  In other words, Fairweather Fish's options are either sell their QS or

9   keep it, but not use it.  Defendants argue that the rule "merely placed a new condition on

10  the use of [QS] received by transfer after the control date."  Dkt. 29 at 44.  While

11  Defendants may have a point as to Captain Welsh, the Court disagrees as to Fairweather

12  Fish because the "condition" is dispositive of Fairweather Fish's right to harvest its QS.

13  Similar to St. Cyr, there is a clear difference between forcing a disabled captain to board

14  a fishing vessel in the open ocean and forcing Fairweather Fish to sell its QS.  *St. Cyr*,

15  533 U.S. at 325 ("[t]here is a clear difference, for the purposes of retroactivity analysis,

16  between facing possible deportation and facing certain deportation.").  The Court finds

17  that such results go beyond imposing additional burdens or frustrating the business

18  expectations of harvesting fish.  Thus, the Final Rule has retroactive effect.

19      The final question the Court must consider is whether there exists clear

20  congressional intent favoring a retroactive result.  *Koch*, 177 F.3d at 786.  In its previous

21  order, the Court overlooked the fact that the halibut and sablefish fisheries are regulated

22  under different Congressional schemes.  Regarding the sablefish fisheries, Defendants

1    argue that Plaintiffs have no reliance interest in their QS because the shares "may be

2    revoked, limited, or modified at any time . . . ."  16 U.S.C. § 1853a(b)(2).  A divided

3    panel of the D.C. Circuit reached the same result when considering similar language

4    governing trademarks.  *See Empresa Cubana Exportadora de Alimentos y Productos*

5    *Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 795 (D.C. Cir. 2011) ("*Cubaexport*").  In

6    *Cubaexport*, a Cuban-based company registered a trademark under an exception to the

7    Trading with the Enemy Act "allowing Cuban-affiliated entities to register and renew

8    U.S. trademarks."  *Id*. at 795.  In 1998, however, Congress modified the exception such

9    that Cubaexport was barred from renewing its trademark when it came up for renewal in

10   2006.  *Id*. at 796.  Cubaexport sued arguing, in part, that the law impermissibly applied

11   retroactively.  *Id*.  The D.C. Circuit disagreed stating that, "[b]ecause the Cuban Assets

12   Control Regulations stated that exceptions were revocable at any time, Cubaexport had

13   no vested right to perpetual renewal of the trademark."  *Id*.

14        Similar to Cubaexport's trademark rights, Plaintiffs' sablefish QS rights were

15   never "vested."  While Plaintiffs argue that the revocation language is insufficient to

16   show clear Congressional intent for retroactive application of regulations (Dkt. 31 at 20–

17   21), the principle is that Congress did not intend to confer vested rights by issuing a QS.

18   Plaintiffs were aware that any sablefish QS they purchased was subject to revocation at

19   any time, which precludes them from asserting that their property rights were either

20   improperly taken away or impaired by the Final Rule.  Although the result seems harsh

21   that Plaintiffs, and others similarly situated, were specifically targeted by Defendants, the

22

1  Court is unable to conclude that Plaintiffs' conditional rights are protected by the

2  presumption against retroactive application.

3          On the other hand, the parties dispute whether § 1853a(b)(2) applies to Plaintiffs'

4  halibut QS.  The Court specifically requested additional briefing on this issue, and the

5  parties submitted additional arguments.  Dkts. 63–66.  Defendants rely on selective

6  language in the MSA and the Halibut Act as well as a significant amount of

7  Congressional intent.  Dkt. 64 at 6–14.  The position seems to be a post hoc rationale for

8  upholding the Final Rule over an identified deficiency that was neither considered nor

9  addressed during the rule making process.  Regardless, Defendants' argument fails the

10  first rule of statutory construction that the Court must begin its analysis with the words of

11  the statute when those words are not ambiguous or will not lead to absurd results.

12  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)

13  ("when [a] statute's language is plain, the sole function of the courts—at least where the

14  disposition required by the text is not absurd—is to enforce it according to its terms")

15  (internal quotation marks omitted).  The operative language of § 1853a(b)(2) is not

16  ambiguous.

17          Section 1853a governs QS "established, implemented, or managed under" the

18  MSA.  16 U.S.C. § 1853a(b).  The halibut management program was neither established

19  nor implemented under the MSA.  The initial federal regulation provides in relevant part

20  as follows:

21          With respect to halibut, section 5(c) of the Halibut Act authorizes the
        Secretary to implement limited access regulations for the U.S. halibut
22          fishery. Such regulations must be consistent with the Halibut Act and

section 303(b)(6) of the Magnuson Act, and must not be in conflict with
IPHC regulations.

58 Fed. Reg. 59376.  The Final Rule similarly provides in relevant part as follows:
"The IFQ Program for the halibut fishery is implemented by Federal regulations at 50
CFR part 300, subpart E, and 50 CFR part 679 under the authority of the Northern Pacific
Halibut Act of 1982 (Halibut Act)."  79 Fed. Reg. 43680.  Finally, binding precedent has
"held that halibut fishing was not governed by the Gulf of Alaska fishery management
plan but by regulations promulgated under the Halibut Act."  *United States v. Ertsgaard*,
222 F.3d 615, 616–17 (9th Cir. 2000) (citing *United States v. Doubleday*, 804 F.2d 1091
(9th Cir. 1986)) (prosecutions for overfishing a halibut QS).  In *Ertsgaard*, the court also
stated that fishing under halibut QS were not "activities regulated by a fishery
management plan in effect under the Magnuson-Stevens Fishery Conservation and
Management Act."  *Id*. at 615 (citation omitted).  While the Court is unable to predict
how the Ninth Circuit will answer the present issue, it would seem unusual and absurd to
hold that halibut QS is not managed under the MSA for criminal prosecution purposes,
but is managed under the MSA for commercial regulation purposes.  Therefore, the Court
declines to adopt Defendants' strained interpretation of § 1853a(b) because it would lead
to absurd results.

The final issue on this claim is when Defendants gave sufficient notice of the
control date.  The parties dispute the operative date for antiretroactivity purposes.
Defendants assert that the public, Plaintiffs, and other regulated parties were aware of the
February 2010 control date as early as January 2010.  Dkt. 64 at 4–5.  This assertion is

1  based on the February 2010 NP Council meeting and the public newsletter reporting on

2  issues addressed at the meeting.  *See* AR 30378–440.  While there is little authority on

3  this specific issue, it would be unreasonable to hold that notice requires only the mention

4  of a proposed solution to a perceive problem by a governing body.  In other words, the

5  proper consideration is "fair" notice, not "some" notice.  *Landgraf*, 511 U.S. at 270.

6  Moreover, "the court must ask whether the new provision attaches new legal

7  consequences to events completed before its *enactment*."  *Id*. at 269–70 (emphasis

8  added).  Although the Court was concerned with notice and requested additional briefing,

9  it appears that notice is not an issue because the Supreme Court is concerned with the

10 law's enactment date.  Accordingly, the Court concludes that the Final Rule is

11 impermissibly retroactive for halibut QS.

12 **D.    Remedy**

13        The remedy for issuing a rule "contrary to a constitutional right" or "otherwise not

14 in accordance with law" is for the reviewing court to "hold [it] unlawful and set aside

15 [the] agency action."  5 U.S.C. § 706(2).  However, "[a] flawed rule need not be

16 vacated."  *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th

17 Cir. 2012).  Courts may "leave an invalid rule in place only when equity demands that we

18 do so."  *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir.

19 2015).  "When determining whether to leave an agency action in place on remand,

20 [courts] weigh the seriousness of the agency's errors against the disruptive consequences

21 of an interim change that may itself be changed."  *Id.* (internal citation and quotation

22 marks omitted).

1    In this case, the parties have extensively briefed an appropriate remedy.  The

2 violations in this case create an interesting dilemma because they demand different

3 remedies.  The violation of the antiretroactivity rule demands vacatur because there is no

4 good reason to leave the rule in place during a remand to NMFS.  The Court is unaware

5 of and Defendants have failed to provide any adequate remedy for this violation.

6 Defendants argue that "NMFS could in theory respond to the contemplated remand by

7 abandoning the Hired Master Rule's restrictions for halibut Quota transferred between

8 the Rule's control date and its effective date."  Dkt. 66 at 10.  However, there is no good

9 reason to place the burden on NMFS, as opposed to granting Plaintiffs' proposed remedy

10 of "vacat[ing] the Final Rule as between the control date (February 12, 2010) and the date

11 that the Final Rule was published in the Federal Register (July 28, 2014)."  Dkt. 65 at 14.

12 A partial vacatur would be more beneficial to all involved because it would clarify the

13 regulation for the upcoming fishing season.  Although NMFS was quick to assess the

14 National Standards, there is no guarantee NMFS would develop and implement a remedy

15 for the impermissibly retroactive violation in time for the 2017 fishing season.

16 Therefore, the Court concludes that the proper remedy for the violation of the

17 antiretroactivity principle is vacatur of the halibut regulation for any transfer before July

18 28, 2014.

19    On the other hand, the violations of the National Standards do not require vacatur.

20 Proper evaluation of the National Standards is well within NMFS's ability to remedy

21 without setting aside the Final Rule, which weighs in favor of remand.  Dkt. 53 at 9–11.

22 In fact, NMFS contends that it has already conducted additional analysis for National

1  Standards 9 and 10.  *Id*.  While this analysis may be sufficient to overcome additional

2  challenges, the Court is concerned with Defendants' contention that public notice and

3  comment is not required on remand.  Dkt. 53 at 10 n.2.  NMFS's previous analysis was

4  subject to notice and comment.  Moreover, to prevent additional litigation, Defendants

5  are informed that their analysis with regard to National Standards 6, 7, and 8 are as

6  flawed as their analysis for numbers 9 and 10.  *See* AR 10042.  The assertions are not

7  even cursory, they are conclusory. *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104,

8  1123 (9th Cir. 2006) ("Although cursory, this analysis indicates that the NMFS

9  considered National Standard No. 10 and thus discharged its duty under § 1855(a)(10).").

10  Therefore, the Court remands the partially vacated rule for further consideration

11  consistent with the Court's orders.

12  **IV. ORDER**

13  Therefore, it is hereby **ORDERED** that Plaintiffs' motion for summary judgment

14  (Dkt. 25) is **GRANTED in part** and **DENIED in part** and Defendants' cross motion for

15  summary judgment (Dkt. 29) is **GRANTED in part** and **DENIED in part** as follows:

16  1.  Defendants failed to properly assess the Final Rule in light of the national

17  standards (Dkt. 49);

18  2.  The Final Rule does not violate the Rehabilitation Act or the Due Process

19  Clause;

20  3.  The Final Rule is impermissibly retroactive with regard to the regulation of

21  halibut QS;

22

1        4.      The Final Rule is partially vacated as to regulation of halibut QS before

2  July 28, 2014; and

3        5.      The Final Rule is remanded to NMFS for further consideration of the

4  National Standards.

5        The Clerk shall enter **JUDGMENT** and close this case.

6        Dated this 16th day of November, 2016.

7

8                                        _____

9                                        BENJAMIN H. SETTLE
                                         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22